R. William Potter
Peter D. Dickson
POTTER AND DICKSON
194 Nassau Street, Suite 31
Princeton, NJ 08542
Telephone: (609) 921-9555
Fax: (609) 921-2181
Email: rwppddlaw@cs.com
and potterrex@cs.com
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BRRAM, INC., ET AL., | :    Civil Action No. 3:14-cv-02686 (JAP) |
|         Plaintiffs, | : |
|      v. | :    Hon. Joel A. Pisano, U.S.D.J. |
| | :    Hon. Douglas E. Arpert, U.S.M.J. |
| UNITED STATES FEDERAL | : |
| AVIATION ADMINISTRATION, | : |
| ET AL., | :        DOCUMENT FILED |
|         Defendants. | :        ELECTRONICALLY |

## PLAINTIFFS' REPLY BRIEF
## TO OPPOSITION TO MOTION FOR LEAVE
## TO AMEND THE COMPLAINT

## PLAINTIFFS REQUEST ORAL ARGUMENT ON
## THE PENDING MOTIONS TO DISMISS THE COMPLAINT
## AND ON THE MOTION TO AMEND THE COMPLAINT.

# Table of Contents

Page

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Plaintiffs' Response to the FAA Brief: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Point 1.    Plaintiffs rely on well-settled caselaw that this court has
            jurisdiction to review the FAA's inaction: . . . . . . . . . . . . . . . . . . . . . 3

Point 2.    The "Ops Specs" amendment sought by Frontier and
            approved by the FAA did not authorize expansion of
            scheduled operations beyond the two flights per week at
            TTN requested by Frontier: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Point 3.    Because the FAA never publicly issued any "Ops Specs"
            order, there is no "final order" to be reviewed in a Court
            of Appeals: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Point 4.    The Airline Deregulation Act (ADA) does not prevent
            the FAA from complying with the requirements of
            NEPA: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Point 5.    The EIS requirements of NEPA also apply to the federal
            government's expenditures of substantial sums on
            terminal and airport expansion necessitated for the
            expansion of Frontier service at TTN, as the FAA
            declared in its 2008 Order: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B. Plaintiffs' Response to the Frontier Airlines Brief (to the extent not
   covered above): . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Point 6.    Frontier Airlines mischaracterizes plaintiff's argument
            by claiming that we allege that "the FAA issued its order
            in letter form:" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Point 7.      Frontier wrongly argues that the "plaintiffs never sought
              reconsideration" of the "Ops Specs" amendment with the
              FAA: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Point 8:      If the 60-day statute of limitations applies, there are
              reasonable grounds in the interest of justice for an
              extension of time to file: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C. Plaintiffs' Response to the Mercer County Brief: . . . . . . . . . . . . . . . . . . . . . 14

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## Table of Authorities

Page

CASES

Aerosource, Inc. v. Slater, 142  F.3d  572 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . 12

Americopters, LLC v. FAA, 441 F.3d 726 (9th Cir. 2006) . . . . . . . . . . . . . . . . . 14

Corbett v. TSA, 767 F.3d 1171 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . 14

Grand Canyon Trust v. FAA, 290 F.3d 339 (D.C. Cir., 2002) . . . . . . . . . . . . . . 11

Henderson v. Shinseki, 131 S.Ct. 1197 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

National Association of Home Builders v. Defenders of Wildlife,
551 U.S. 644 (2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Ramsey v. Kantor, 96 F.3d 434 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Safe Extensions, Inc. v.  FAA, 509 F.3d 593 (D.C. Cir. 2007)  . . . . . . . . . . . . . 12

Sierra Club v. U.S. Dept.of Transp., 7l5 3 F. 2d 120 (D.C.Cir.1985)  . . . . . . . . . 9

State of Illinois ex rel Scott v. Butterfield, 396 F.Supp. 623
(N.D. Ill. 1975)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATUTES

42 U.S.C. § 4332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

49 U.S.C. § 41109(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

49 U.S.C. § 41109(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

49 U.S.C. § 41110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

49 U.S.C. § 41110(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

REGULATIONS

FAA Order 5050.4B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**Statement of the Case:**

This memorandum responds to the opposition of the Federal Aviation Administration ("FAA"), Frontier Airlines ("Frontier") and Mercer County to plaintiffs' motion to amend our complaint which seeks to add three Pennsylvania municipalities as coplaintiffs, and to clarify that we do not challenge the FAA's permission, expressed in a private exchange of letters (Ops Specs) and revealed for the first time in this lawsuit, that authorized Frontier to operate two flights a week at Trenton Mercer Airport (TTN). The defendants' arguments that an amendment would be "futile" are irrelevant because they are based on the false premise that we challenge the Ops Specs decision. This includes their arguments that the Ops Specs is an "order" subject to review only in the Court of Appeals, and arguments about the timeliness of this lawsuit.

We emphasize that we are not challenging any action of the FAA, but inaction. After giving authorization in a letter known only to a mid-level FAA manager and an official of Frontier that Frontier could operate those two flights a week, the FAA ignored the requirements of the National Environmental Policy Act (NEPA) as Frontier increased operations exponentially beyond the level approved by the FAA without the FAA conducting any environmental and safety reviews of Frontier's "business decision." It is well-settled that agency inaction will confer jurisdiction in the District

Page 1 of 15

Courts to compel enforcement of NEPA.

We address the defendants' claims in this reply. But what the defendants do not contest is just as compelling. They do not dispute that (1) the FAA failed to perform any environmental or safety analysis of Frontier's expansion of scheduled service far beyond the 2 flights per week in Frontier's Ops Specs amendment , (2) the FAA has not issued any order specifically authorizing Frontier's expansion of scheduled service at TTN, (3) the FAA did not perform any NEPA analysis prior to funding numerous construction projects at TTN intended to attract a high-frequency air carrier to the airport, (4) the FAA failed to provide any public notice of Frontier's Ops Specs amendment request or authorization, (5) the FAA did not conduct any proceedings or solicit public comment prior to granting Op Specs approval to Frontier, (6) the FAA's 2008 Order assured plaintiffs that prior to funding future TTN enhancement projects designed to attract a high-frequency air carrier the noise impacts would require preparation of an EIS, and (7) the FAA letter of May 8, 2013 to plaintiffs pledged to release a "noise mitigation" study of Frontier operations which the FAA has never done.

Page 2 of 15

**A. Plaintiffs' Response to the FAA Brief:**

**Point 1.     Plaintiffs rely on well-settled caselaw that this court has jurisdiction to review the FAA's inaction:**

In our brief opposing the defendants' motion to dismiss, we discussed a long line of cases in which the courts have held that agency <u>inaction</u>, failing to initiate any NEPA proceedings or to issue any FAA order, is reviewable in the District Courts. See, e.g., <u>State of Illinois ex rel Scott v. Butterfield</u>, 396 F.Supp. 623 (N.D. Ill. 1975), and progeny, cases cited in plaintiffs' brief in opposition to motion to dismiss (Pb) 20-24. Defendants ignore this crucial precedent. They are content to recycle inapposite caselaw reviewing the adequacy of NEPA actions taken by the FAA – such as preparation of an EIS or an EA – unlike what is found in this case: the complete absence of any FAA environmental or even safety reviews of Frontier's expanded operations at TTN, and the lack of any FAA decision or order on these important questions.

**Point 2.     The "Ops Specs" amendment sought by Frontier and approved by the FAA did not authorize expansion of scheduled operations beyond the two flights per week at TTN requested by Frontier:**

The FAA and Frontier claim that the terms of the Ops Specs amendment requested by Frontier and approved by the FAA a few days later authorized expansion of service by Frontier far beyond the proposed schedule of two flights per week. FAA

brief ("Faab") at 13-14, Frontier brief ("Falb") at 1, 3-4). This is untrue. As we have emphasized, the Ops Specs amendment sought by Frontier was limited specifically to two flights per week at TTN. Simply put, there is no FAA order, no written decision or subsequent letter discussing or approving any level of service beyond the two flights per week.

Moreover, even if the Ops Specs amendment request had been made public, and it was not, it contained nothing to put anyone on notice that the approved Ops Specs would be construed by FAA as permission for Frontier to initiate unlimited expansion of service at TTN without any environmental or safety review.

We briefly review the uncontested facts. On September 19, 2012, Mr. Colburn, Director of Operations for Frontier, sent a two-page letter to Mr. Snider, an official of the FAA, stating: "Please accept this letter as notification Frontier Airlines intends to begin *scheduled service* from Trenton New Jersey (TTN). Service is *scheduled* to begin on November 16, 2012, utilizing the Airbus A320 series aircraft." (Italics added.) Only two *scheduled* flights are referenced in the amendment request, and that is all the FAA approved. The concluding paragraph does say: "Please accept this as Frontier Airlines official letter of request to add Trenton New Jersey (TTN) to the Frontier Airlines operations specifications CO70 airports as a Regular (R) and Alternate (A) airport." The letter by Mr. Snider defines "Regular Airport" as an "Airport approved under

*scheduled service* to the community as a regular stop to that community."

The only reasonable way to interpret this exchange of cryptic, private letters – first revealed in this litigation – is that Frontier requested approval for only those two "Regular" or *scheduled* departures, both on Friday, and that is what the FAA approved. The declaration by Mr. Montigney, attached to the FAA's motion for dismissal, tries to inflate this Ops Specs permission into blanket authorization for Frontier to conduct unlimited scheduled service at TTN:

> Once Frontier's Ops Specs were approved to permit it to operate at [TTN], Frontier required no further approvals with respect to service at TTN. Frontier is free to determine which other airports approved in this Ops Specs it will serve from TTN, *as well as the number of flights it will provide. These matters are business decisions made by the air carrier without FAA involvement*." (Italics added.)

Significantly, none of this language appears in the Ops Specs approval letter. Nor does Mr. Montigney cite to any regulation or statute to support this troubling interpretation of the Ops Specs amendment process, and for good reason -- none exists. This is an absurd argument: an air line applies for permission to operate just two flights per week, the FAA determines that it is safe to do so, and thereafter the air carrier is free to operate an <u>unlimited</u> number of flights without any further FAA review of the safety or environmental impacts of the air carrier's exponentially expanded operations. This hands off "policy" has no basis in law or logic.

Accordingly, the court must find that the FAA has never issued any order or decision which authorizes, or even addresses, Frontier's decision to expand scheduled operations at TTN far beyond the approved schedule of 2 flights per week. And there being no such FAA order, this court has jurisdiction to consider directing the FAA to comply with NEPA, and to grant plaintiffs' motion to amend the complaint.

**Point 3.        Because the FAA never publicly issued any "Ops Specs" order, there is no "final order" to be reviewed in a Court of Appeals:**

As we have demonstrated, for an agency order to be deemed "issued," the order must have been made public in a suitable manner, particularly to those reasonably interested in the matter. Pb 25-27. Defendants cite to no caselaw to the contrary. Therefore, lacking any public notice or opportunity to be heard before the FAA issued the Ops Specs amendment, never mind the open-ended expansion which followed, the court must find that there was no "final order" appealable solely to the Court of Appeals. Nor does the 60-day time limit for filing this NEPA action apply. Consequently, this court has subject matter jurisdiction.

**Point 4.        The Airline Deregulation Act (ADA) does not prevent the FAA from complying with the requirements of NEPA:**

The FAA and Frontier argue that the Airline Deregulation Act of 1978 (ADA) somehow repealed the requirements of NEPA as applied to the FAA's regulation of commercial aviation. The ADA itself does not say this. In the 36 years since passage of

the ADA, no court has ever so held. A later-enacted statute does not implicitly repeal another earlier law on the same subject. To be deemed a "repealer," the more recent statute must expressly state that its enactment will repeal certain specific laws or sections of other laws. When confronted with two statutes addressing the same subject matter, the reviewing court must seek to find a reasonable way to harmonize the enactments. This hornbook rule of statutory construction was recently reaffirmed by the Supreme Court in <u>National Association of Home Builders v. Defenders of Wildlife</u>, 551 U.S. 644, 665-665 (2007) which provides this instructive guidance:

> While a later enacted statute...can sometimes operate to amend or even repeal an earlier statutory provision ... repeals by implication are not favored and will not be presumed unless the intention of the legislature to repeal is clear and manifest. We will not infer a statutory repeal unless the later statute expressly contradicts the original act, or such a construction is absolutely necessary ... in order that [the] words [of the later statute] shall have any meaning at all. ... Outside these limited circumstances, a statute dealing with a narrow, precise, and specific subject is not submerged by later enacted statute covering a more generalized spectrum. [<u>Home Builders</u>, 551 U.S. at 664-665, citations omitted.]

If the FAA is correct that authorizing 2 flights a week is tantamount to authorizing unlimited operations, <u>then the Ops Specs amendment is itself a "major federal action</u> significantly affecting the quality of the human environment," which triggers NEPA environmental review.

We now demonstrate how this court can "harmonize" the provision in the ADA, 49 U.S.C. § 41109(a)(2)(B), that "the Secretary of Transportation [FAA] may not prescribe a term preventing an air carrier from adding or changing schedules, equipment, accommodations, and facilities for providing the authorized transportation to satisfy business development and public demand" with the commands of section 102(2)C of NEPA, 42 U.S.C. § 4332, and the implementing regulations of the FAA, Order 5050.4B, et seq., which include the FAA's duty to prepare an EIS to assess and mitigate the impacts of Frontier operations. See Ramsey v. Kantor, 96 F.3d 434, 445 (9th Cir. 1996), often cited for the principle that federal agency inaction or refusal to act may constitute "federal action" for purposes of triggering the EIS provisions under NEPA; and see also cases previously reviewed, Pb 20-24 .

At least two ways may be found to harmonize the ADA with NEPA. First, prior to approving Frontier's Ops Specs amendment request, the FAA could have inquired of the applicant to obtain its long-range plan, including specification of the maximum number of flights contemplated by the air carrier. With information in hand revealing that Frontier was intent upon expanding operations far beyond two flights per week, including late night arrivals and early morning departures, the FAA was obligated to initiate a NEPA process as it had in 1999 when it assessed the impacts of the contemplated enhancement of TTN to accommodate high-frequency commercial

service. Pb at 3-6. But the FAA made no effort at harmonizing the ADA with its NEPA duties. The FAA had an important job to do and it did not do it.

A second option for harmonizing the ADA with the NEPA is to invoke Section 41110 of the ADA which provides authority for the FAA to suspend, modify or revoke the Ops Specs amendment *after* it was issued and Frontier's expansion plans were put into action. This clause provides as follows:

> (a) GENERAL. – (1) each certificate issued under Section 41102 of this title is effective from the date specified in it and remains in effect until – (A) the Secretary of Transportation [FAA] suspends or revokes the certificate under this section; or ... (2) on application or on the initiative of the [FAA] and after notice and an opportunity for hearing ... the [FAA] may (A) amend, modify, or suspend any part of a certificate if the [FAA] finds the public convenience and necessity require amendment, modification, or suspension; and (B) revoke any part of a certificate if the [FAA] finds that the holder of the certificate intentionally does not comply with this chapter....

In this manner the ADA provides a means for the FAA to comply with the mandates of NEPA and initiate a modification or suspension process limiting Frontier Airlines to a certain number of flights while the FAA commences the NEPA process to review the environmental and safety impacts of Frontier's high-frequency service. The FAA employed such a "look back" NEPA procedure in Sierra Club v. U.S. Dept. of Transp., 753 F.2d 120, 121 (D.C. Cir. 1985).

Thus, there is no irreconcilable conflict between the dictates of NEPA and the

terms of the ADA.

**Point 5.**     **The EIS requirements of NEPA also apply to the federal government's expenditures of substantial sums on terminal and airport expansion necessitated for the expansion of Frontier service at TTN, as the FAA declared in its 2008 Order:**

Our brief in opposition to the defendants' motion to dismiss contains a recitation of the many airport enhancement projects at TTN that have been funded in whole or part by the federal government in the past few years, all for the overarching purpose of attracting a "low-fare/high-frequency" (LF/HF) air carrier. These include $8,550,000 for construction of a "parallel taxiway" and $6,650,000 "to complete a full parallel taxiway for the north side of the TTN terminal." Pb at 16-17. The total sum of federal expenditures is $66,547,500. Exhibit 5 to Plaintiffs' Complaint at 6-7 and "Notice of Opportunity for Public Comment," "FY2008-2014 Capital Improvement Program," generally, appended hereto as Exhibit 43.[1]

With these construction projects, Mercer County hoped to attract an LF/HF air carrier to replace Southwest Airlines which had bowed out of its plan to locate at TTN. Pb at 3-6. By themselves, these capital construction projects arise to the level of "major federal action" mandating application of NEPA, as the FAA had acknowledged in 1999 when it commenced a public environmental assessment ("EA") proceeding to review

---

[1] Exhibit 43 had been appended to Complaint Exhibit 5, when it was submitted to the FAA October 31, 2013.

the TTN projects then in the pipeline. See Pb at 3-5, and FAA Order 1050.1E, Sec. 308d (NEPA triggered by projects that would "significantly change the operating environment of an airport"), and <u>Grand Canyon Trust v. FAA</u>, 290 F.3d 339 (D.C. Cir., 2002) (FAA duty to consider "cumulative noise impacts" resulting from airport improvement projects).

Importantly, the FAA Order in 2008 also conceded that "the analysis of Build Alternative 2 [airport projects to attract LF/HF service] revealed that that alternative would likely cause sufficient noise impacts that would <u>require the preparation of an Environmental Impact Statement</u>." Pb at 16-17; Complaint Exhibit 2, emphasis added. The FAA's "about face" from its 2008 position remains unexplained.

**B. Plaintiffs' Response to the Frontier Airlines Brief (to the extent not covered above):**

**Point 6.**     **Frontier Airlines mischaracterizes plaintiff's argument by claiming that we allege that "the FAA issued its order in letter form:"**

Contrary to the Frontier argument, Falb at 4-5, plaintiffs' objection is not to the letter *form* of the FAA action nor to the *terms* in those letters as contained in a private, electronic exchange of correspondence. As we have clarified in the amended complaint, plaintiffs' object to the FAA's subsequent <u>interpretation</u> of those two letters as having authorized *sub silentio* unlimited expansion of operations at TTN. Put simply, there is no FAA decision or *order* granting Frontier permission to expand beyond the two

Page 11 of 15

scheduled flights per week as requested on September 19, 2012 and as approved by the FAA on September 25, 2012. Hence, there is no order for any court to review, and no basis for filing a petition to the Court of Appeals whose jurisdiction is limited to review of "final orders" of the FAA.

Frontier's reliance on <u>Aerosource, Inc. v. Slater</u>, 142 F.3d 572, 578, n. 10 (3d Cir. 1998) is misplaced. In that case the court reasoned that "in view of all the circumstances of this case, none of the documents at issue here can be regarded as a reviewable order [as] ... none of the materials has the indicia of an order." In this case, there is neither an "order" nor "materials" that could be cobbled together to constitute an "order" or Record of Decision (ROD) approving of Frontier's expansion of service. Finally, there being no "final order" to appeal from, it also follows that the 60-day statutory time limit as set forth in 49 U.S.C. § 46110 (a) for filing a petition in the Court of Appeals to contest an FAA order or ROD does not apply either. Thus, Frontier's reliance on <u>Safe Extensions, Inc. v. FAA</u>, 509 F.3d 593, 599 (D.C. Cir. 2007), in which the court determined to "remand to the agency so the agency can provide a record for review," is also misplaced. The threshold issue here is not the adequacy of the record but the absence of any written decision or order of any kind addressing Frontier's quantum expansion of flights and the FAA's NEPA <u>inaction</u>.

**Point 7.**     **Frontier wrongly argues that the "plaintiffs never sought reconsideration" of the "Ops Specs" amendment with the FAA:**

Contrary to Frontier's argument, Falb at 10, plaintiffs <u>did</u> seek reconsideration of the FAA's belatedly revealed interpretation of the Ops Specs amendment. Reconsideration was sought in letter form in October 2013, but there was never any FAA reply. This is yet another reason for this court taking jurisdiction. See Pb at 24-26.

**Point 8:**     **If the 60-day statute of limitations applies, there are reasonable grounds in the interest of justice for an extension of time to file:**

The defendants repeat earlier arguments that this action is "time -barred" and that no "reasonable grounds" exist for an extension, Faab at 11-12, Falb at 7-8, which we have previously rebutted. Pb at 24-27. Most importantly, they failed to counter plaintiffs' well-documented position that the FAA has never "issued" what may properly be defined as "a final order" granting approval for the Ops Specs amendment, nor for Frontier's expansion of service beyond two flights per week, nor that the FAA failed to publish any notice of the Ops Specs amendment, all of which is necessary to "start the clock" on the 60 days time limit. And even if it had been publicly issued, the amendment did not address the unexamined – and apparently unlimited – expansion of service which followed. Hence there is no order, nothing in writing, that would provide the basis for petition to the Court of Appeals.

Frontier cites to two recent cases to support its argument, but both are easily

Page 13 of 15

distinguished. In <u>Corbett v. TSA</u>, 767 F.3d 1171, 1178 (11th Cir. 2014), the plaintiff waited two years after his case was dismissed in the District Court to file a petition with the Court of Appeals which properly dismissed the petition as untimely and without reasonable grounds for enlargement of time. The same court also ruled that the 60-day deadline is "not jurisdictional," it is a "nonjurisdictional claims-processing rule," citing <u>Henderson v. Shinseki</u>, 131 S.Ct. 1197, 1204-1206 (2011). In <u>Americopters, LLC v. FAA</u>, 441 F.3d 726, 734 (9th Cir. 2006), the complainants received actual written notice in multiple letters from FAA officials informing them that their roof-top helicopter service was "unsafe" and "unauthorized." Here, we hardly need to remind the court, the Ops Specs amendment was never issued to the public; nor is there is any FAA decision concerning the expansion of service far beyond the two flights per week.

## C. Plaintiffs' Response to the Mercer County Brief:

Because the Mercer County brief is limited to incorporating argument by the FAA and Frontier there is no need for a separate reply.

## Conclusion:

While this case involves operations at a small regional airport in New Jersey, its implications go far beyond the geographic contours of Mercer and Bucks Counties and will have important national significance. As uncovered in this case, the FAA has embraced a "policy," without any prior public review or debate, of allowing an airline

to exponentially increase the frequency of flights into and out of TTN, far beyond the

number of flights specifically authorized by the FAA without the FAA conducting <u>any</u>

environmental and even safety analysis. It is that hands off "policy" which is on trial –

or will be, if this court determines it has subject matter jurisdiction, and grants plaintiffs

their motion to amend the complaint.

Dated: January 20, 2014.                    Respectfully submitted,

                                    <u>     / s/ R. William Potter      </u>
                                    R. William Potter
                                    POTTER AND DICKSON
                                    194 Nassau Street, Suite 31
                                    Princeton, NJ 08542-7003
                                    Email addresses: <u>rwppddlaw@cs.com</u>
                                    and <u>potterrex@cs.com</u>
                                    Phone (609) 921-9555; Fax (609) 921-2181
                                    Attorneys for the Plaintiffs

Of Counsel and on brief:
Peter Dickson

Page 15 of  15

May 17, 2013

# Notice of Opportunity for Public Comment

### Intent to File Application to "Impose and Use" Passenger Facility Charges at the Trenton Mercer Airport

Mercer County intends to file an application to "Impose and Use" Passenger Facility Charges (PFC) with the Federal Aviation Administration (FAA) that will allow the County to augment its capital improvement program at the Trenton Mercer Airport. As required under Section 158.24 of CFR Part 158, "Passenger Facility Charges", Mercer County is hereby providing public notice of its intent to file the application.

Comments may be filed with Ms. Melinda Montgomery, A.A.E., Airport Manager, at the address listed below on or prior to June 16, 2013. Comments received by that date will be considered by the County and will be forwarded with the application to the FAA. More detailed project justification information will be provided upon written request to Ms. Montgomery.

Trenton Mercer Airport
1100 Terminal Circle Drive, Suite 301
West Trenton, NJ  08628-2411

Under the new PFC program, the total estimated net PFC revenue will be $2,913,645 with an estimated charge effective date of August 1, 2013 and an estimated charge expiration date of July 30, 2016. The application to "Impose and Use" will allow collection of PFCs to continue at the $4.50 level. The project descriptions, justifications, PFC level, and project costs are listed below.

**Project No. 1 – Acquire Snow Removal Equipment**

PFC Level: $4.50
PFC Eligible Cost (Local Share):  $134,567
Start Date: August, 2003
Completion Date: April, 2008

Description:  Provide funding for the County's local matching requirements of the Acquire Snow Removal Equipment projects at the Airport. This project was divided into two phases due to funding limitations. Phase 1 included the purchase of four snow removal vehicles; one multi-purpose unit (with rotary plow and sweeper attachments) and three displacement plows with carrier vehicles. Phase 2 included the purchase of two new snow removal vehicles; one multi-purpose unit (with rotary blower, broom, and reversible plow attachments) and one high speed plow unit. All vehicles are for the exclusive use at the Trenton Mercer Airport. The total cost for the project was $1,917,538. FAA AIP Program grants 3-34-0042-026-03 and 3-34-0042-030-05, reimbursed the County $1,763,909 (90% and 95% respectively for each phase) of the total project cost for purchase of the vehicles. NJDOT State Aviation did not offer a matching grant for phase 1 however did offer a matching grant for phase 2 in the amount of $19,062 (2.5% of the Phase 2 total cost). Mercer County's local requirement for this project was $134,567. Therefore, PFC funding will financially support the $134,567 share of the Project.

Justification:  The new equipment enhanced the Airport maintenance and snow removal crew's ability to remove snow from the airport's priority 1 pavement areas within the timeframe (1-inch of snow in 30 minutes) recommended in FAA Advisory Circular 150/5220-20 Airport Snow and Ice Control Equipment. The new equipment replaced aging and inadequate equipment that existed at the time of purchase.

Exhibit 43

**Project No. 2 – Rehabilitate Taxiways "A", "C", and "J"**

PFC Level: $4.50
Estimated PFC Eligible Cost (Local Share): $198,697
Start Date: July, 2004
Estimated Completion Date: December, 2013

Description: Provide funding for the County's local matching requirements of the Rehabilitate Taxiways "A", "C", and "J" project at the Airport. The project generally included the design and construction for the Rehabilitation of Taxiways "A" (3600L.F. X 75LF), "C" (1,572 LF X 75 LF), and "J" (2464 LF X 75 LF) including pavements, drainage, lighting and signage, markings and wind cone. The estimated total cost for the project is $7,947,934. FAA AIP Program grants 3-34-0042-027-04, 3-34-0042-031-05, 3-34-0042-034-07, 3-034-0042-036-09, and 3-36-0042-037-10 is providing funding for 95% of the total project cost; $7,550,537. NJDOT State Aviation matching grants are providing $198,698 (2.5%) towards the total cost of the project. Mercer County's local requirement for this project is $198,699. Therefore, PFC funding will financially support the $198,699 share of the Project.

Justification: Taxiways "A", "C", and "J" serve an important role in providing access for the airport users at Trenton-Mercer Airport. These taxiways were deteriorated and aged; beyond repair by normal maintenance procedures. Major rehabilitation was necessary to return them to good condition for safe aircraft operations. This project repairs and rehabilitates these taxiways, while extending the useful life of the pavement sections. The approximate length of these taxiways total 7,636 feet. The rehabilitation project primarily consists of repairing cracks, reconstructing major portions of the taxiways that have failed, mill the top surface course and provide an overlay of the taxiways with bituminous pavement. Portions of the airfield required the alteration of taxiway fillets and the removal of excessive taxiway pavement that is no longer useful for the circulation of aircraft.

**Project No. 3 – Improve Runway 6-24 and Runway 16-34 Safety Areas (EMAS)**

PFC Level: $4.50
Estimated PFC Eligible Cost (Local Share): $1,230,781
Start Date: August, 2009
Estimated Completion Date: December, 2014

Description: Provide funding for the County's local matching requirements of the Runway 6-24 and Runway 16-34 Safety Area Improvements (EMAS) projects. The Project will generally involve design and construction of the installation of non-standard EMAS at the ends of Runways 6, 24, 16 and 34 as recommended in the September 29, 2008 FAA Runway Safety Area Determination. The total cost for the project is $31,733,598. FAA AIP Program grants 3-34-0042-035-09 and 3-34-0042-038-11 provide 95% funding and 3-34-0042-041-12 provide 90% funding of the respective total estimated cost of each phase of this project. The three FAA AIP grants total $29,353,818. NJDOT State Aviation matching grants provide a total of $1,148,999 towards the total cost of the project. Mercer County's local requirement for this project is $1,230,781. Therefore, PFC funding will financially support the $1,230,781 share of the Project.

Justification: The existing extended runway safety areas at each end of Runways 6-24 and 16-34 do not comply with required FAA safety area standards. A Runway Safety Area Study concluded that installation of EMAS at each runway end was the most appropriate option for improving the extended safety areas. The EMAS sites at all runway departure ends of both runways are not large enough to support full performance EMAS systems with 70 knot predicted stopping power for the aircraft fleet mix operating at Maximum Take-Off Weight and 80% of Maximum Landing Weight in accordance with FAA Order 5200.9. The design provides for installation of 50-strength EMAS beds which provide a minimum predicted performance of 55 knots or greater for Category C aircraft, meet all of the other requirements of the governing FAA Orders and Advisory Circular, and represent significant improvements to the existing RSA deficiencies. The EMAS installations satisfy FAA Part 139 safety area standards when installed.

**Project No. 4 – Rehabilitate Taxiways H, B, and F**

PFC Level: $4.50
Estimated PFC Eligible Cost (Local Share): $785,425
Start Date: August, 2011
Estimated Completion Date: December, 2018

Description: Provide funding for the County's local matching requirements of the Taxiways H, B, and F Rehabilitation project at the Airport. This project generally includes rehabilitation of approximately 54,000 SY of bituminous taxiway. The work will generally consist of full-depth reconstruction of the bituminous pavement. Additionally associated grading and drainage improvements; edge lighting and guidance sign improvements including replacement of signs and fixtures, light bases and transformers, installation of a conduit system with new power and counterpoise cables; pavement markings; and restoration of adjacent turf surfaces are included in the project. The taxiway areas to be rehabilitated include Taxiway "H" from the Runway 16 end to Taxiway "B" including the portion along the Ronson Aviation apron and stub Taxiway "A"; Taxiway "B" from the Runway 24 end and Johnson & Johnson stub to the Taxiway "C" intersection; and Taxiway "F" from Runway 6-24 to Taxiway "B". The total estimated cost for the project is $16,025,000. An initial FAA AIP Program grant for design phase services was issued in FY 2011 (3-34-0042-039-11) in the amount of $973,750 to fund 95% of the total cost of the design of the project. A NJDOT state matching grant provides funding for 2.5% of the total estimated design phase costs. A stand alone NJDOT State Aviation grant in an amount of $2,500,000 was recently offered to fund a portion of the construction of the project. The $2,500,000 represents approximately 95% of an initial phase of construction estimated total $2,642,000. The balance of the construction funds ($12,358,000) are identified as candidate projects on the current airport 5-year capital improvement plan for 90% funding in each of the fiscal years 2014 thru 2017. NJDOT Aviation matching grants in the amount of 5% are also being requested in those future fiscal years. In total FAA AIP funding of $12,095,950 is currently estimated with an additional $3,143,625 from NJDOT leaving a balance of $785,425 local funding for this project. Therefore, PFC funding will financially support the local share of the project currently estimated to equal $785,425.

Justification: The taxiways are currently in poor condition beyond repair by normal maintenance procedures. The existing condition of the taxiway pavements are such that total reconstruction is anticipated to be required. The current PCI index is estimated to be from 40 – 55. The existing lighting is over 15 years old (direct buried cable and some stake mounted lights) and is at the end of its service life cycle.

**Project No. 5 – Airfield Marking**

PFC Level: $4.50
PFC Eligible Capital Cost (Local Share): $13,021
Start Date: February, 2011
Estimated Completion Date: March, 2012

Description: Provide funding for the County's local matching requirements of the Airfield Marking project at the Airport. The project includes installation of new enhanced taxiway centerline markings and surface painted holding position markings for each runway. The NJDOT provided 95% funding for this $260,423 ($247,402 state share) marking project. Mercer County's local share for the project equals the 5% balance; $13,021. Therefore, PFC funding will financially support the $13,021 share of this project.

Justification: Recent changes of the standards require surface painted holding position markings and enhanced taxiway centerline markings. The marking improvements completed as part of this project resulted in the airport meeting the new FAA pavement marking standards thus enhancing safety of aircraft operating at the airport.

**Project No. 6 – Acquire and Install Wildlife fence**

PFC Level: $4.50
PFC Eligible Capital Cost (Local Share): $3,750
Start Date:  June, 2009
Completion Date:  December, 2010

Description:  Provide funding for the County's local matching requirements of the Airport Security Fencing project at the Airport. The project generally included installation of approximately 2,000 feet of ten-foot high security/wildlife fencing including two twelve-foot manual swing gates, to prohibit entry by individuals and wildlife into the active Airport Operations Area (AOA). The NJDOT provided 95% funding for this $75,000 ($71,250 state share) fencing project. Mercer County's local share for the project equaled the 5% balance; $3,750. Therefore, PFC funding will financially support the $3,750 share of this project.

Justification: This project prohibits/deters deer from migrating from a heavily wooded area inside the fence line onto the area adjacent to the main ILS Runway 06 near Air Hangar. The project also provides a double protective security barrier abeam this very active public thoroughfare. The project was conceived and recommended by the Airport's Wildlife Hazard Management Committee and USDA to reduce wildlife hazards at Trenton-Mercer Airport.

**Project No. 7 – Airport Security Fencing**

PFC Level: $4.50
Estimated PFC Eligible Cost (Local Share):  $72,502
Estimated Start Date: July, 2013
Estimated Completion Date: December, 2014

Description: Provide funding for the County's local matching requirements of the Airport Security Fencing project at the Airport. The project generally includes removal of approximately 24,000 LF of perimeter security fencing and replacement with fencing that meets current TSA security and FAA wildlife deterrent standards. In addition, the project is expected to include up to five aircraft rescue crash gates, two pedestrian gates, and ten motorized vehicle gates for improved airfield access. The NJDOT is expected to provide 95% funding for this $1,450,044,000 ($1,377,542 state share) fencing project in the near future. Mercer County's local share for the project equals the 5% balance; $72,502. Therefore, PFC funding will financially support the estimated $72,502 local share of this project.

Justification: The existing fencing does not meet FAA or TSA standards. The existing airfield security fence is over 25 years old and portions of the perimeter fence are as much as 1.5 feet above grade, or leaning/falling due to compromised stability. This project will provide a new security fence that will be installed along the secure side of the airport, and will replace the existing 6' and 8' fence. This project is necessary to repair and maintain security at the airport. The USDA has previously recommended fencing improvements in order to deter wildlife from entering the airport environment. This will be accomplished with a 2' embedding of the fence fabric.

**Project No. 8 – Replace ARFF Vehicles 343 and 344**

PFC Level: $4.50
Estimated PFC Eligible Cost (Local Share):  $87,500
Estimated Start Date: August, 2013
Estimated Completion Date: December, 2014

Description:  Provide funding for the County's local matching requirements of the Replace ARFF Vehicles 343 and 344 project at the Airport. This project includes the purchase of two new Aircraft Rescue and Fire Fighting (ARFF) vehicles to replace old and aging vehicles. As a Part 139 airport with scheduled commercial service it is vital the airport have ARFF equipment sufficient to handle emergency situations. The total cost for the project is estimated to equal $1,750,000. An FAA AIP Program grant is being requested for reimbursement of 90% of the total project cost; $1,575,000. In addition, a matching NJDOT State Aviation grant is being requested for 5% ($87,500) of the total cost this project. Mercer County's local requirement for this project will be the 5% balance remaining $87,500. Therefore, PFC funding will financially support the $87,500 share of the Project.

Justification:  As a Part 139 airport with scheduled commercial service it is vital the airport have ARFF equipment sufficient to handle emergency situations when called upon. Existing equipment is old and aging and becoming unreliable. It is difficult to obtain parts in a reasonable timeframe when repairs are necessary. The new equipment will replace aging unreliable equipment that currently exists.

## Project No. 9 – Terminal Building Modifications

PFC Level: $4.50
Estimated PFC Eligible Cost:  $315,000
Estimated Start Date: August, 2013
Estimated Completion Date: December, 2013

Description:  Provide funding for the Terminal Building Modifications project at the Airport. The work proposed is within the existing building envelope and will improve the queuing of passengers passing through security as well as provide a secure and improved hold room area for passengers awaiting boarding of aircraft. Included in the building modification is the creating of restrooms in a portion of the existing space within the boarding area for the convenience of passengers who have successfully passed through the security check point. The total estimated cost for the project is $315,000. This project will be funded totally with PFC collections. Therefore, PFC funding will financially support the total $315,000 for the Project.

Justification:  The existing building was originally constructed in the 1970's prior to today's current increased security requirements. There has been limited scheduled commercial service at the airport since the increased security regulations were instituted after the 2001 tragedy. Frontier Airlines recently started scheduled service from Trenton Mercer Airport significantly increasing the passenger activity at the airport. The proposed terminal building modifications will improve security and handling of the increased passenger activity generated resulting from Frontiers new service.

## Project No. 10 – PFC Program Administration

PFC Level: $4.50
Estimated PFC Eligible Cost:  $72,400
Estimated Start Date: March, 2013
Estimated Completion Date: September, 2016

Description:  Provide reimbursement for costs incurred in the preparation of the PFC application, required accounting and reporting, and annual audits. Only those administrative costs associated with PFC Application XX-XX-X-XX-TTN are included within this application.

Justification:  Public agencies may use PFC revenue to pay for allowable administrative support costs during the life of the Passenger Facility Charge program as described in 14 CFR Part 158. This project is being undertaken to reimburse the County for costs associated with the preparation and administration of this PFC process. The PFC Project Application contains projects that meet PFC project eligibility criteria 1 by preserving or enhancing the safety, security, and capacity of the national air transportation system.